IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY HAMMOND MURPHY,<br><br>Plaintiff,<br><br>v.<br><br>CROWD COW, INC.,<br><br>Defendant. | Civil Action No.    21-2Erie<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Anthony Hammond Murphy[1] ("Murphy" or "Plaintiff"), for his Complaint

against Crowd Cow, Inc. ("Crowd Cow" or "Defendant"), by and through his counsel, alleges

upon personal knowledge as to himself and upon information and belief as to all other matters,

based upon the investigation conducted by and through his counsel, which includes, among other

things, an investigation of Defendant's digital properties, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This action arises from Defendant's failure to make its digital properties

accessible to blind individuals,[2] which violates the effective communication and equal access

requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-

12189. These provisions were enacted "to provide a clear and comprehensive national mandate

---

[1]      He/Him/His (*see* University of Pittsburgh, Gender-Inclusivity Guidelines, available at
http://www.gsws.pitt.edu/node/1432 (last accessed Dec. 23, 2020)).

[2]      Murphy uses the word "blind" to describe individuals who, as a result of a visual
impairment, have substantially limited eyesight. This includes individuals who have no vision at
all as well as people who have low vision.

for the elimination of discrimination against individuals with disabilities"[3] by "assur[ing]
equality of opportunity, full participation, independent living, and economic self-sufficiency."[4]

2.      Although styled as an individual action, the injunctive relief that Murphy seeks
will inure to the benefit of an estimated 2.3 percent of the United States population who report
having a visual disability,[5] and to Defendant, who will extend its market reach to this
population.[6]

3.      For this significant portion of Americans, accessing websites, mobile applications,
and other information via their smartphones has become a necessity, not a convenience. In
contrast to the largely stationary internet of the early 2000s, Americans today are increasingly
connected to the world of digital information while "on the go" via smartphones.[7]

4.      Indeed, a growing share of Americans use smartphones as their primary means of
online access at home. Today roughly one-in-five American adults are "smartphone-only"
internet users—meaning they own a smartphone, but do not have traditional home broadband
service.[8]

_____

[3]      42 U.S.C. § 12101(b)(1).
[4]      42 U.S.C. § 12101(a)(7).
[5]      Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American
Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), available
at www.disabilitystatistics.org (last accessed Dec. 23, 2020).
[6]      Sharron Rush, W3C Web Accessibility Initiative, *The Business Case for Digital
Accessibility* (Nov. 9, 2018), available at https://www.w3.org/WAI/business-case/ (last accessed
Dec. 23, 2020) ("The global market of people with disabilities is over 1 billion people with a
spending power of more than $6 trillion. Accessibility often improves the online experience for
all users.").
[7]      The wide-scale adoption of this technology is staggering. According to Pew Research
Center, the vast majority of Americans – 96% – now own a cellphone of some kind. And the
share of Americans that own smartphones has climbed from just 35% in 2011 to 81% in 2019—
amounting to more than 265 million people in the United States. U.S. Census Bureau, U.S and
World Population Clock, available at https://www.census.gov/popclock/ (last accessed Dec. 23,
2020) (U.S. population on June 12, 2019 was 328.1 million).
[8]      Pew Research Center, *supra* note 7.

5.      The growth of smartphone usage is rivaled only by the myriad ways in which

users can harness the capabilities of the internet for the betterment of their lives through

education, employment, entertainment, commerce, and countless other pursuits.

6.      The U.S. Chamber of Commerce has documented consumers' increasing reliance

on mobile platforms to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a
> number that's continuing to rise. The convenience, affordability and ability to
> compare prices with ease has led more and more customers to visit e-commerce
> sites before heading to a brick-and-mortar location.[9]

> New research by Leanplum found that 95% of consumers will buy at least half of
> their gifts online. Shoppers, especially millennials and Gen Zers, favor the
> convenience and the great offers and discounts associated more with shopping
> online than visiting a brick-and-mortar location. It's these groups that are driving
> e-commerce retailers to be strategic with their website design. The Leanplum
> survey found that 80% of respondents shop on their mobile devices.[10]

7.      The Supreme Court has even acknowledged the phrase, "'There's an app for that'

has become part of the 21st-century American lexicon." *Apple Inc. v. Pepper*, 139 S. Ct. 1514,

1518, 203 L.Ed.2d 802, 806 (2019).

---

[9]      Emily Heaslip, U.S. Chamber of Commerce, *A Guide to Building an Online Store* (Sept.
20, 2019), available at https://www.uschamber.com/co/start/startup/how-to-build-online-stores
(last accessed Dec. 23, 2020).

[10]      Emily Heaslip, U.S. Chamber of Commerce, *5 Ways to Optimize Your E-Commerce Site
for Mobile Shopping* (Jan. 6, 2020), available at
https://www.uschamber.com/co/run/technology/building-mobile-friendly-ecommerce-websites
(last accessed Dec. 23, 2020).  According to one report, e-commerce is growing 23% each year[.]
Emily Heaslip, U.S. Chamber of Commerce, *The Complete Guide to Selling Online* (Jan. 28,
2020), available at https://www.uschamber.com/co/run/technology/small-business-ecommerce-
guide (last accessed Dec. 23, 2020).

8.     But "[a]s technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities."[11]

9.     This is especially true with respect to accessing the internet by smartphone, where people with disabilities stand to benefit immensely if online services were fully and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard of hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.[12]

10.     When digital content is properly formatted, it is universally accessible to everyone. When it's not, the content provider fails to communicate to individuals with a visual disability effectively. In turn, these individuals must expend additional time and effort to

---

[11]     National Council on Disability, *National Disability Policy: A Progress Report* (Oct. 7, 2016), available at https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed Dec. 23, 2020).

[12]     Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119 -AA65, available at https://nfb.org/ada-title-iiiinternet-regulations-joint-sanprm-comments (last accessed Dec. 23, 2020), Answer 57 (October 7, 2016) (citations omitted).

overcome communication barriers not applicable to sighted users, which may require the assistance of third parties or, in some instances, may deny outright access to the online service.[13]

11.     Unfortunately, Defendant fails to communicate effectively with Murphy because its digital properties are not properly formatted. Because of these communication barriers, Defendant deprives consumers with visual disabilities, including Murphy, from accessing information about its products and using its online services, all of which is readily available to sighted persons.

12.     This action seeks to remedy that discrimination and inequality.

## JURISDICTION AND VENUE

13.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

14.     Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing products and services over the internet to Pennsylvania residents, including Murphy. Unlike, for example, a winery that may not be able sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Pennsylvania residents.[14] These online contacts between Defendant and

---

[13]     These factors often lead disabled individuals to abandon the process of purchasing items online after they begin.  Kasey Wehrum, Inc., *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It* (Jan. 2014), available at https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-online-customers-to-complete-purchase.html (last accessed Dec. 23, 2020) (documenting the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

[14]     *See Gniewkowski v. Lettuce Entertain You Enterprises*, Case No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017) *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc*., 952 F.Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website

Pennsylvania residents involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the internet in Pennsylvania.

15.     Murphy was injured when he attempted to access the Digital Platform from Erie, Pennsylvania, but encountered communication barriers that denied him full and equal access to Defendant's online products, content, and services.

16.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Murphy's claims occurred.

**PARTIES**

17.     Murphy is a natural person over the age of 18. He resides in and is a citizen of Erie, Pennsylvania, located in Erie County.

18.     He graduated from Edinboro University with a degree in sociology in 1999 and today he works for the Commonwealth of Pennsylvania.

19.     Murphy is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*. As a result of his blindness, Murphy relies on screen access software, including JAWS 2020 from Freedom Scientific and VoiceOver with iOS, to access digital content, like an email, a website, or an app.

---

accessibility claims against out-of-forum hotel operator); *Law School Admission Council, Inc. v. Tatro*, 153 F.Supp.3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator); *Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc*., 298 F.Supp.3d 296 (D. Mass. 2018) (same).

20.     Murphy has advocated for blind individuals his entire life.[15] To this end, in a class action complaint asserting claims identical to this individual action, the United States District Court for the Western District of Pennsylvania found that Murphy would fairly and adequately represent a class of "[a]ll blind or visually disabled individuals who use screen reader auxiliary aids to navigate content and who have accessed, attempted to access, or been deterred from attempting to access, or who will access, attempt to access, or be deterred from accessing the [defendant's website] from the United States." *Murphy v. Charles Tyrwhitt*, 2020 U.S. Dist. LEXIS 222540, at *9 (W.D. Pa. Nov. 25, 2020).

21.     Defendant is a Delaware corporation with a principal place of business in Washington.

22.     Defendant sells clothing and accessories to consumers.

23.     In order to access and purchase the products and services that Defendant offers, Murphy may visit Defendant's online store at https://www.crowdcow.com/ (the "Digital Platform").

24.     Defendant owns, operates, and/or controls its Digital Platform and is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

---

[15]     *How did Erie plow crews do?: Your view from Facebook*, GoErie.com (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.") (last accessed Dec. 23, 2020)

## STANDING UP FOR TITLE III OF THE ADA

25.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination."[16] "It was called the '20th Century Emancipation Proclamation for all persons with disabilities.'"[17] "Title III of the ADA contained broad language covering numerous public accommodations; both new construction and existing facilities were required by the statute to remove barriers to access. The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose."[18] "However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[19]

26.     Thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the

---

[16]     Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), available at http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (last accessed Dec. 23, 2020) (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990)).

[17]     Kelly Johnson *supra* note 16 (*quoting* Russell Hymas & Brett R. Parkinson, Comment, *Architectural Barriers Under the ADA: An Answer to the Judiciary's Struggle with Technical Non-Compliance*, 39 CAL. W. L. REV. 349, 350 (2003), available at https://scholarlycommons.law.cwsl.edu/cgi/viewcontent.cgi?article=1166&context=cwlr (last accessed Dec. 23, 2020)); *see also* 136 CONG. REC. 17,369 (1990) (statement of Sen. Tom Harkin) (discussing how facilities have failed to comply with the ADA by not removing barriers that impede access).

[18]     Kelly Johnson *supra* note 16 (*citing* Elizabeth Keadle Markey, Note, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 FORDHAM L. REV. 185 (2002), available at https://ir.lawnet.fordham.edu/flr/vol71/iss1/4 (last accessed Dec. 23, 2020) (arguing for a more lenient standard for standing under the ADA)).

[19]     Kelly Johnson *supra* note 16 (*citing* Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. REV. 1, 3 (2006), available at https://www.uclalawreview.org/the-perversity-of-limited-civil-rights-remedies-the-case-of-abusive-ada-litigation/ (last accessed Dec. 23, 2020) (discussing the need for private enforcement in Title III of the ADA and the fact that the limitations courts are placing on ADA plaintiffs are causing abusive litigation)).

ADA allows both the U.S. Attorney General[20] and private individuals[21] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[22]

27.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[23] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[24]

28.     DOJ supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation" for ADA compliance, "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[25]

29.     Courts recognize this dynamic too.

[Defendant] also points to the number of cases filed by the same plaintiff in this jurisdiction. Counsel have filed nine cases in this jurisdiction on behalf of [the plaintiff]. I am not impressed by this argument. If the ADA were enforced directly by the government, as are, for example, the fair housing laws, it is likely that government lawyers would have reached out to disabled individuals — "testers" as they are called — to find out which businesses were complying and which were not. [The named plaintiff] has functioned here as a "tester," which is entirely appropriate.[26]

---

[20]     42 U.S.C. § 12188(b).

[21]     42 U.S.C. § 12188(a).

[22]     42 U.S.C. § 12188(a).

[23]     *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[24]     *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

[25]     Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, Case No. 1:09-cv-03157 (D. Md.), ECF No. 38, at 1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

[26]     *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (Young, J.) (*quoting Iverson v. Braintree Prop. Assocs., L.P.*, No. 04cv12079-NG, 2008 WL 552652, at *3 n.5 (D. Mass. Feb. 26, 2008) (Gertner, J.); *see also Murphy v. Bob Cochran Motors, Inc.*, No.

30.     Consistent with the policies summarized above, Murphy now assumes the role of private attorney general to ensure Defendant communicates effectively with him and other consumers who demand full and equal screen reader access to Defendant's digital services.

## SUBSTANTIVE ALLEGATIONS

31.     The internet is a significant source of information, services, and transactions with instant and 24/7 availability and without the need to travel to attain them.

32.     Individuals who are blind access the internet and mobile applications from smartphones and/or personal computers by using keyboard controls and screen access software, which vocalizes information presented visually on a computer screen or displays that information on a user-provided refreshable braille display. Such software provides the only method by which blind individuals can independently access digital information and content. When websites and applications are not designed to allow for use with screen access software, blind individuals are unable to access the information, products, and services offered through the internet.

33.     Screen access technology has existed for decades[27] and widely-accepted standards exist to guide entities in making their websites and apps accessible to screen access software, including legal standards under Section 508 of the Rehabilitation Act. The U.S. Department of Health & Human Services maintains Best Practices for Accessible Content to ensure that accessibility is "considered throughout the [website] development process."[28] The

---

1:19-cv-00239, 2020 U.S. Dist. LEXIS 139887, at *15-16 (W.D. Pa. Aug. 4, 2020), *adopted by Murphy v. Bob Cochran Motors, Inc.*, 2020 U.S. Dist. LEXIS 177593 (W.D. Pa., Sept. 28, 2020) (upholding tester standing in a substantially identical ADA website accessibility case).
[27]     Annemarie Cooke, American Foundation for the Blind, *A History of Accessibility at IBM* (Mar. 2004), available at https://www.afb.org/aw/5/2/14760 (last accessed Dec. 23, 2020) (Jim Thatcher created the first screen reader at IBM in 1986.)
[28]     *See* U.S. Department of Health & Human Services, usability.gov, Accessibility Basics, available at https://www.usability.gov/what-and-why/accessibility.html (last accessed Dec. 23, 2020).

Commonwealth of Pennsylvania has maintained an Information Technology Accessibility Policy since March 16, 2006,[29] and a separate Accessibility Policy that recognizes "[a]ccessible websites ensure that as many people as possible can use internet-based information and services, regardless of disability or functional limitation."[30]

### Defendant's Inaccessible Digital Platform

34.     Defendant owns, operates, developed, procured, maintains and/or uses the Digital Platform for the purpose of communicating information about its products and services to consumers through computers, smartphones, and other mobile devices.

35.     Defendant is required to ensure that its Digital Platform communicates information about its products and services effectively to people with disabilities. Despite this obligation, Defendant fails to communicate this information effectively to individuals who are blind because the Digital Platform is not compatible with screen reader auxiliary aids.

36.     Specifically, Murphy attempted to access Defendant's Digital Platform from Pittsburgh, Pennsylvania using JAWS 2020 from Freedom Scientific or VoiceOver with iOS (i.e. on his Apple iPhone).

---

[29]     Pennsylvania Office of Administration, Information Technology Policy: Information Technology Accessibility Policy, Mar. 16, 2006, available at https://www.oa.pa.gov/Policies/Documents/itp_acc001.pdf (last accessed Oct. 13, 2020).
[30]     Commonwealth of Pennsylvania, Accessibility Policy, available at https://www.pa.gov/accessibility-policy/ (last accessed Oct. 13, 2020).

37.     "VoiceOver is a gesture-based screen reader that lets you enjoy using iPhone even if you don't see the screen. With VoiceOver enabled, just triple-click the Home button (or the side button on iPhone X or later) to access it wherever you are in iOS. Hear a description of everything happening on your screen, from battery level to who's calling to which app your finger is on. You can also adjust the speaking rate and pitch to suit you. …You can control VoiceOver using a simple set of gestures. Touch or drag your finger around the screen and VoiceOver



tells you what's there. Tap a button to hear a description, then double-tap to select. Or flick left and right to move from one element to the next. When you interact with an element, a black rectangle appears around it so sighted users can follow along. When you prefer privacy, you can activate a screen curtain to turn off the display completely, but still hear all that VoiceOver has to say. And now with iOS 13, you can choose from a wide range of gestures and assign those you're most comfortable with to the commands you use most."[31]

38.     Here is an example of another online store's successful use of alternative text to describe its products to screen reader users.[32] The image on the left illustrates what shoppers perceive visually when browsing the online store with an iPhone. To the right, is an image



---

[31]     *See* Apple, Accessibility, https://www.apple.com/accessibility/iphone/vision/ (last accessed Dec. 23, 2020).
[32]     *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019).

from the online store with the alternative text highlighted for that image in green. Although invisible to the eye, screen access software reads this highlighted text aloud in order to describe the image to shoppers who cannot perceive content visually. In this example, when shoppers tab to the image file with a screen reader, the online store announces, "One burlap and cotton tote bag with a custom printed architectural company logo." Blind shoppers require descriptive alternative text like this to access digital content fully, equally, and independently.

39.     Unfortunately, because of Defendant's failure to build its Digital Platform in a manner that is compatible with screen access software, including VoiceOver, Murphy is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access from his smartphone.

40.     As a result of visiting the Digital Platform, and from investigations performed on his behalf, Murphy found that Defendant fails to communicate information about its products and services effectively because screen reader auxiliary aids cannot access important content on the Digital Platform. Click the images or links at the end of each subparagraph below to watch a short video illustrating some of the communication barriers on Defendant's Digital Platform.

(a)     The Digital Platform prevents screen reader users from accessing some primary content. For example, when shoppers visit the Digital Platform from a new IP address, Defendant displays a pop-up window offering them the chance to "Unlock FREE Ground Beef Forever When You Become a Member!" Shoppers who perceive content visually can type their email into the text field that Defendant provides in the pop-up window, then click "SIGN UP



WITH EMAIL" to claim the promotion. Unfortunately, Defendant does not alert screen readers of this pop-up window. Instead, screen readers remain focused on the content of the Digital Platform's underlying page, making the pop-up invisible to screen reader users. As a result, it is impossible for Plaintiff to perceive this promotion independently, the effect of which would require him to pay more for ground beef than shoppers who do not use screen reader technology to shop online. Click the picture contained in this paragraph or following link to view a short video describing this access barrier: https://youtu.be/Q2Rk0WycE1E.

(b)      The Digital Platform does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative  read aloud using synthesized speech. For example, the Digital Platform provides a five-star rating for many products that Defendant sells. Shoppers who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant's accessibility policies fail to provide sufficiently descriptive alternative text for this important rating information. To this end, when screen readers tab to the stars on the Digital Platform, Defendant announces "outdoor," only. Because this alternative text is meaningless, Plaintiff must make his purchasing decisions without the benefit of knowing whether the products he's researching are well received by other shoppers. Click the picture contained in this paragraph or following link to view a short video describing this access barrier: https://youtu.be/S7GDvp8EPxA.

14

(c)      The Digital Platform uses  visual cues to convey content and other information. Unfortunately, screen readers cannot interpret these cues and communicate the information they represent to individuals with visual disabilities. For example, shoppers who perceive content visually will notice that many products available for purchase on the Digital Platform include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. Shoppers who perceive content visually will understand that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Unfortunately, screen readers cannot identify the meanings of these two fonts so that users can make an informed decision. Instead, Defendant announces two prices for the same product, making it difficult for shoppers to determine with certainty what they signify, like different quantities, conditions, sizes, or in this case, sales. This unnecessary confusion frustrates Plaintiff's ability to make informed purchasing decisions, and increases the odds he will abandon the purchase process without making a selection at all. Click the picture contained in this paragraph or following link to view a short video describing this access barrier: https://youtu.be/Vx0ZYLSqYKY.

(d)      Shoppers who perceive
content visually will notice an information icon
during the checkout process. These shoppers may
click the icon to learn more about the differences
between recurring versus single orders.
Unfortunately, shoppers cannot tab to the pop-up



window that appears after selecting the information icon with a screen reader. As a result, it is
impossible for Plaintiff to access this important information independently, thereby forcing him
to make purchasing decisions without the same information that Defendant provides shoppers
who do not use screen readers to access online content. Click the picture contained in this
paragraph or following link to view a short video describing this access barrier:

https://youtu.be/nGeqgD-nT7Y.

(e)      Defendant fails to provide
informative error messages and a means of
navigating to them when shoppers are required to
fix a form submission. It is inevitable that, on
occasion, screen reader users will be unsuccessful
in submitting information into an online form. In



these cases, screen reader users should be redirected to the page they were on prior to the error or
to the error itself. For example, shoppers who perceive content visually will see red error
indicators on the Digital Platform when, for example, they fail to include required content. These
shoppers can scroll up the page to provide the missing information indicated in red.
Unfortunately, Defendant fails to similarly redirect screen reader users to the error indicators

when appropriate. As a result, Plaintiff is less likely to resolve any errors and complete the form successfully. Click the picture contained in this paragraph or following link to view a short video describing this access barrier: https://youtu.be/pQ1pXvNUIVM.

## Plaintiff's Injury

41.     As a result of the access barriers described above, and others, Defendant fails to communicate information about its products and services to Murphy effectively, which in turn denies Murphy full and equal access to Defendant's online store and deters him from returning to the store in the future.[33]

42.     Still, Murphy intends to attempt to access the Digital Platform within the next six months to research the products and services Defendant offers or to test the Digital Platform for compliance with the ADA.[34]

43.     If the Digital Platform were accessible (*i.e.* if Defendant removed the access barriers and implemented the practices described herein), Murphy could independently access Defendant's online services.

## Defendant's Digital Platform Must Comply with the ADA

44.     The ADA "as a whole is intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'"[35]

45.     Title III advances that goal by providing that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public

---

[33]     *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It*, *supra* note 13.
[34]     *See Norkunas* and *Iverson supra* note 28.
[35]     *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999) (*quoting* 42 U.S.C. § 12101(b)(1)).

accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[36]

46.     DOJ regulations require that a public accommodation "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."[37]

47.     DOJ defines "auxiliary aids and services" to include "accessible electronic and information technology" or "other effective methods of making visually delivered materials available to individuals who are blind or have low vision."[38]

48.     Therefore, the ADA mandates that places of public accommodation provide auxiliary aids and services to make visual materials available to individuals who are blind.[39]

49.     Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment."[40]

50.     The Digital Platform is a service, facility, advantage, or accommodation of Defendant.

51.     As a service, facility, advantage, or accommodation of Defendant, Defendant must ensure blind patrons have full and equal access to the Digital Platform.

52.     Indeed, the ADA expressly provides that a place of public accommodation engages in unlawful discrimination if it fails to "take such steps as may be necessary to ensure

---

[36]     42 U.S.C. § 12182(a).
[37]     28 C.F.R. § 36.303(c)(1); *see Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (holding that DOJ's administrative guidance on ADA compliance is entitled to deference).
[38]     28 C.F.R. § 36.303(b)(2).
[39]     28 C.F.R. § 36.303.
[40]     42 U.S.C. § 12181(7)(E), (F).

that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[41]

### Defendant Received Fair Notice of its ADA Obligations

53.     Defendant and other covered entities have had more than adequate notice of their obligation to offer individuals with disabilities an equal opportunity to access and enjoy their services and communications, including the Digital Platform.

54.     Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities,[42] and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[43]

55.     The United States Department of Justice ("DOJ") first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals.[44]

56.     Since then, DOJ has "repeatedly affirmed the application of [T]itle III to Web sites of public accommodations."[45]

---

[41]     42 U.S.C. § 12182(b)(2)(A)(iii).
[42]     42 U.S.C. § 12182(a).
[43]     42 U.S.C. § 12182(b)(2)(A)(iii).
[44]     Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), available at w https://www.justice.gov/crt/foia/file/666366/download (last accessed Dec. 23, 2020)
[45]     75 Fed. Reg. 43460-01, 43464 (July 26, 2010).

57.     In 2000, DOJ argued to the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[46]

58.     In 2002, DOJ argued to the Eleventh Circuit that there need not be a nexus between a challenged activity and a private entity´s "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off the premises.[47]

59.     In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website, www.peapod.com, is inaccessible to some individuals with disabilities, in violation of the ADA. DOJ's enforcement action against this online-only business affirms the ADA covers public accommodations that do not operate brick-and-mortar facilities open to the public.[48]

60.     In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

---

[46]     Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, Case No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last accessed Dec. 23, 2020) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[47]     Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions, Inc.*, Case No. 01-11197, 294 F.3d 1279 (11th Cir. 2002), available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf (last accessed Dec. 23, 2020).

[48]     *See* Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), available at https://www.justice.gov/file/163956/download (last accessed Dec. 23, 2020).

The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[49]

61.     In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III") covers websites and mobile applications and (2) the imposition of liability on businesses for not having an accessible website and mobile application does not violate the due process rights of public accommodations.[50]

62.     Thus, since at least since 1996, Defendant has been on notice that its online offerings must effectively communicate with disabled consumers and facilitate "full and equal enjoyment" of the products and services it offers.[51]

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

63.     The assertions contained in the previous paragraphs are incorporated by reference.

64.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.[52]

---

[49]     *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last accessed Dec. 23, 2020).
[50]     *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019) cert. denied 589 U.S. ___ (U.S. Oct. 7, 2019) (No. 18-1539).
[51]     42 U.S.C. § 12182(a).
[52]     42 U.S.C. § 12182; 28 C.F.R. § 36.201.

65.     Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities.[53]

66.     Murphy is legally blind and therefore an individual with a disability under the ADA.

67.     Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment."[54]

68.     Defendant owns, operates, or maintains the Digital Platform.

69.     The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendant.

70.     The Digital Platform contains communication barriers that prevent full and equal use by blind persons, including Murphy, using screen access software.

71.     Because of these communication barriers, Defendant denies Murphy full and equal enjoyment of the information, products, services, facilities, privileges, advantages, or accommodations that it makes available to the sighted public through the Digital Platform.

72.     These access barriers now deter Murphy from attempting to use the Digital Platform.

73.     Defendant's discrimination is ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Murphy requests judgment as follows:

---

[53]     28 C.F.R.§ 36.303(c).
[54]     42 U.S.C. § 12181(7)(E), (F).

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure Defendant communicated the digital content of its Digital Platform to individuals with disabilities effectively such that Murphy could fully, equally, and independently access Defendant's products and services;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to communicate the content of its Digital Platform to screen reader users effectively such that Defendant's online products and services are fully, equally, and independently accessible to individuals with visual disabilities, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully below:[55]

(1)     Within 90-days of the Court's Order, Defendant shall complete an accessibility audit of its Digital Platform that will examine the accessibility and usability of the Digital Platform by consumers who are blind.

---

[55]     The injunctive relief herein is consistent with a 2011 settlement agreement entered into between National Federation of the Blind and The Pennsylvania State University, available at https://accessibility.psu.edu/nfbpsusettlement/ (last accessed Dec. 23, 2020); a 2014 settlement agreement between the U.S. Department of Justice and Ahold U.S.A., Inc. and Peapod, LLC, *supra* note 47; and a 2014 Resolution Agreement between the U.S. Department of Education and Youngstown State University, available at https://www2.ed.gov/documents/press-releases/youngstown-state-university-agreement.pdf (last accessed Dec. 23, 2020).

(2)      Within 180-days of the Court's Order, Defendant shall develop a corrective action strategy ("Strategy") based on the audit findings. In addition to the deadlines outlined below, the Strategy shall include dates by which corrective action shall be completed.

(3)      Within 210-days of the Court's Order, Defendant shall disseminate the Strategy among its executive-level managers, employees, and contractors, if any, involved in digital development and post it on the Digital Platform.

(4)      Within 90-days of the Court's Order, Defendant shall develop a Digital Accessibility Policy Statement that demonstrates its commitment to digital accessibility to blind and other print disabled consumers, as required by the Americans with Disabilities Act. This Policy Statement shall be posted in the header of each homepage on the Digital Platform within 120-days of the Court's Order, and shall disclose that an audit is taking or has taken place and that a Strategy will be disseminated and posted on the Digital Platform within 180-days of the Court's Order.

(5)      Within 240-days of the Court's Order, Defendant shall develop procedures to implement its Digital Accessibility Policy across the entire Digital Platform. Defendant shall disseminate its Policy and procedures to its executive-level managers, employees, and contractors, if any, involved in digital development.

(6)      Within 12-months of the Court's Order, Defendant shall conduct training, instruction and support to ensure that all executive-level managers and employees involved in digital development are aware of and understand the Digital Accessibility Policy, including proper procedures, tools, and techniques to implement the Digital Accessibility Policy effectively and consistently.

(7)     Within 12-months of the Court's Order, Defendant shall hire or designate a staff person with responsibility and commensurate authority, to monitor the Digital Accessibility Policy and procedures.

(8)     Within 12-months of the Court's Order, Defendant shall develop and institute procedures that require third-party content and plug-ins built into the Digital Platform to provide blind consumers the same programs, benefits and services that they do to individuals without disabilities, except that when it is technically unfeasible to do so. Defendant shall effectuate these obligations by, among other things, implementing as part of its Request for Proposal process language that bidders meet the accessibility standards set forth in WCAG 2.0 Level AA for web-based technology and the Americans with Disabilities Act; requiring or encouraging, at Defendant's discretion, as part of any contract with its vendors, provisions in which the vendor warrants that any technology provided complies with these standards and any applicable current federal disability law.

(9)     Within 18-months, all pages hosted on the Digital Platform that have been published shall be Accessible to blind users. "Accessible" means fully and equally accessible to and independently usable by blind individuals so that blind consumers are able to acquire the same information, engage in the same interactions, and enjoy the same services as sighted consumers, with substantially equivalent ease of use.

(10)    Defendant shall not release for public viewing or use a substantial addition, update, or change to the Digital Platform until it has determined through automated and user testing that those proposed additions, updates, or changes are Accessible.

(11)    Defendant shall conduct (a) an automated scan monthly and (b) end-ser testing quarterly thereafter to ascertain whether any new posted content is accessible. Defendant

25

shall notify all employees and contractors, if any, involved in digital development if corrections to Digital Platform are needed and of reasonable timelines for corrections to be made. Defendant shall note if corrective action has been taken during the next monthly scan and quarterly end-user test.

(12)     Following the date of the Court's Order, for each new, renewed, or renegotiated contract with a vendor of Third-Party Content, Defendant shall seek a commitment from the vendor to provide content in a format that is Accessible.

(13)     Defendant shall provide Plaintiff, through his counsel, with a report on the first and second anniversaries of the Court's Order which summarize the progress Defendant is making in meeting its obligations. Additional communication will occur before and after each anniversary to address any possible delays or other obstacles encountered with the implementation of the Digital Accessibility Policy.

(C)     Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment;[56]

---

[56]     S*ee Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) ("[Plaintiff], as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984), the fee petition may include costs to monitor [Defendant's] compliance with the permanent injunction."); *see also* Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, Case No 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed Dec. 23, 2020) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendant has complied with

the Court's Orders.

Dated: January 4, 2021                    */s/ Lawrence H. Fisher*

                                          Lawrence H. Fisher
                                          Pa. Bar ID #67667
                                          One Oxford Centre
                                          301 Grant Street, Suite 4300
                                          Pittsburgh, PA 15219
                                          Tel. (412) 577-4040
                                          lawfirst@lawrencefisher.com

---

connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).